2020 IL App (1st) 200616

FOURTH DIVISION
Filing Date December 4, 2020

No. 1-20-0616

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| In the Interest of: | ) | |
| | ) | Appeal from the |
| ARMANI S., | ) | Circuit Court of |
| | ) | Cook County. |
| Minor-Respondent- Appellant, | ) | |
| | ) | No. 20 JA 00006 |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | The Honorable |
| Petitioner-Appellee, | ) | Patrick T. Murphy, |
| | ) | Judge, Presiding. |
| v. | ) | |
| | ) | |
| ERICKA S., | ) | |
| | ) | |
| Mother-Respondent-Appellee, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BRUCE P., | ) | |
| | ) | |
| Father-Respondent-Appellee.) | ) | |

_____

JUSTICE HALL delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1        This appeal arises from an order of the trial court finding that respondent Bruce P. is minor, Armani S.'s, father. This finding was made after Bruce voluntarily accepted parentage in court under oath after repeatedly refusing to comply with the trial court's previous order to submit to DNA testing. On appeal, the public guardian, representing the minor, contends that the trial court violated the Illinois Parentage Act of 2015 (Parentage Act) (750 ILCS 46/101 *et seq.* (West 2016)) in finding that Bruce is the minor's legal father where he refused to take a DNA test in defiance of the trial court's order. The State concedes that the trial court's parentage finding for Bruce violated the procedures for adjudicating parentage contained in the Parentage Act.[1] For the following reasons, we affirm the order of the trial court.

¶ 2                                    BACKGROUND

¶ 3        On January 3, 2020, the State filed a petition for adjudication of wardship alleging that the minor, born December 27, 2019, was abused and neglected. The State also filed a motion for temporary custody of the minor. Both the petition and motion alleged that the minor was abused due to substantial risk of physical injury and neglected due to an injurious environment. These allegations were based on a sibling's adjudication as abused and neglected, and that Ericka S. failed to complete reunification services. The petition for adjudication of wardship further alleged that the minor's father was unknown.

¶ 4        On January 9, 2020, the trial court held an initial temporary custody hearing, which was the first hearing in the case. The public guardian was appointed to represent the minor. Ericka was present and testified that she had never been married. When she was asked the identity of

---

[1] Respondent-Mother's counsel sent a letter to this court indicating that no appellee's brief would be filed and that she would adopt the arguments made by the public guardian and the State.

the minor's father, Ericka replied that she did not know but she knew that he was her child. Ericka further testified that Leonard T., who had been named the father of one of the minor's siblings, could possibly be the minor's father. No one was named as the minor's father on his birth certificate and no one had signed a voluntary acknowledgement of parentage for the minor. Ericka testified that there were no other possible fathers for the minor.

¶ 5       The parties agreed that the minor could remain in Ericka's custody under an order of protection, pursuant to section 2-25 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-25 (West 2018)). The trial court entered an order of protection and temporary custody order, finding no urgent need to remove the minor from his home.

¶ 6       The trial court also issued a writ for Leonard, who was incarcerated, to appear at the next court date, to give him "a chance to do a DNA test," and the case was continued until January 15, 2020. On that date, Leonard appeared and requested parentage testing, which the trial court ordered. The case was then continued until March 3, 2020.

¶ 7       On March 3, 2020, the State informed the court that DNA testing ruled out Leonard as the minor's father. Marsha Godard, a caseworker for the Department of Children and Family Services (DCFS), testified that in February 2020, Ericka told her that another man (Bruce) could possibly be the minor's father.

¶ 8       Following Godard's testimony, Ericka appeared and testified in open court that Bruce was the minor's father and that he was incarcerated in Cook County Jail. The court then held a permanency hearing for the minor's sibling, who had been adjudicated neglected and made a ward of the court. The trial court entered an order returning the sibling home to Ericka under an order of protection, after hearing evidence that Ericka completed various services. The trial court also entered an order requiring Bruce to submit to DNA testing and that his DNA results

be compared with the minor's preexisting DNA sample. The court also issued a writ for Bruce, who was in Cook County Jail, so that he could appear at the next court hearing.[2]

¶ 9        Bruce appeared in court on March 5, 2020. Ericka was not present. When the trial court informed him that Ericka thought he could be the minor's father, Bruce replied, "Yeah, possibly." The court asked if Bruce wanted to take a DNA test and Bruce replied, "No." Bruce then stated, "I know for sure already." Bruce indicated to the court that he wanted to accept parentage. The trial court asked Bruce a series of questions before passing the case to appoint an attorney for him.

¶ 10       On the minor's behalf, the public guardian requested that Bruce submit to a DNA test. The court replied, "I don't see any reason for it. They have a right to - - to order - - have it, but I always accept the word of the - - you know, the mother and the father both say he's the father. If you want it, you can get it."

¶ 11       When the trial court again asked Bruce if he would take a parentage test, Bruce repeatedly and emphatically refused to submit to a test. Bruce testified under oath that he was the minor's father, but was not at the hospital when he was born and was not paying child support. The court again passed the case so that Bruce's attorney could appear. Bruce's attorney subsequently told the court that after talking with Bruce, he still refused to do a DNA test.

¶ 12       The trial court pondered how to force Bruce to take a DNA test if he says he was the father. The court acknowledged the minor's right to request the DNA test, but suggested that it was impossible to do without Bruce's cooperation.

---

[2] The court's parentage order of March 3, 2020, appears in the common law record; however, the report of proceedings does not contain a discussion about the parentage order for Bruce.

¶ 13        The public guardian and the State both objected to the trial court making a finding of paternity in Bruce's favor, noting that Ericka had previously named another father for the minor. The trial court responded that "in paternity court, if someone walks in and says, I'm the father, not only do they accept it, but under Illinois Supreme Court, they're stuck until the kid's 21." The public guardian informed the trial court that the Parentage Act authorized contempt proceedings as a sanction for Bruce's noncompliance with the court's DNA order. The public guardian and the State also pointed out that the DCFS caseworker had testified that Ericka told her that Bruce was a "possible" father, so there was still uncertainty about his parentage.

¶ 14        Bruce's attorney informed the court that Bruce was "absolutely sure" that he was the minor's father. The court then stated, "Well, if the public guardian can figure out a way to do it- I mean, if you want to come down and hold him down and do it * * * [he] looks like a pretty tough guy to me." Bruce responded, "I am."

¶ 15        The trial court subsequently stated, "Well if he says he's the father, I don't see any reason for [the DNA test]." The public guardian informed the court that the Parentage Act only allowed paternity findings based on an admission of paternity when there was no reason to question the admission. Both the State and the public guardian objected to the parentage finding in Bruce's favor, and the court replied, "that's why I'm putting the motion to vacate. Then you guys can, A, go out and find another for me or B, bring the mother to name some other father or C, come in and tell me how I'm going to force him to do a DNA test." The court stated, "[H]e says he's the dad, so I'm going to make a finding of paternity," and entered an order accordingly. Ericka's attorney did not offer a position on the issue, and a status date was set for April 23, 2020.

¶ 16     The public guardian filed a timely notice of appeal on March 31, 2020.

¶ 17                                    DISCUSSION

¶ 18     On appeal, the minor contends, and the State agrees that the trial court's parentage finding for Bruce violated the procedures for adjudicating parentage contained in the Parentage Act. They note that the Parentage Act does not allow a trial court to enter a parentage finding where an alleged father admits to parentage while simultaneously refusing parentage testing. Both parties contend that the court allowed Bruce to control the proceedings and to manipulate the litigation of the minor's parentage. Both parties also agree that the consequence of the trial court's order is to estop the minor from relitigating the issue of paternity in the future, even if new evidence comes to light that conclusively establishes that another man is his father. Though the parties disagree as to the correct standard of review, the parties agree that: the trial court's order is directly contrary to the Parentage Act, the order should be vacated, Bruce should be held in contempt and allowed to purge the contempt by submitting to a parentage test.

¶ 19                                  A.  Jurisdiction

¶ 20     While findings of parentage are not generally final and appealable orders in their own right (*In re the Marriage of Dee J. and Ashlie J.*, 2018 IL 170532, ¶ 3), we find that Supreme Court Rule 304(b)(1) (Ill. S. Ct. R. 304(b)(1) (eff. Mar. 8, 2016)) gives this court jurisdiction over the appeal. That rule provides that an order entered in a guardianship or similar proceeding which finally determines a right or status of a party is immediately appealable without any special finding from the trial court regarding appealability. *In re Devon M.*, 344 Ill. App. 3d 503, 508 (2003). In this case, the trial court's order of March 5, 2020, finally determined Bruce's status as the minor's father, and both the minor and Bruce were parties to the case.

¶ 21                                   B.  Standard of Review

¶ 22        As to the standard of review, the public guardian contends that this appeal presents an issue of statutory construction as there are no disputed facts and the trial court's order should be reviewed purely in the context of whether it circumvented and contravened the Parentage Act. The public guardian thus contends that our review is *de novo*.

¶ 23        Conversely, the State contends that the trial court abused its discretion in entering a paternity order in Bruce's favor when there was uncertainty regarding his admission of paternity.  Additionally, the State contends that the trial court abused its discretion when it failed to enforce its DNA order through a contempt proceeding, as that denied the minor his statutory right to a paternity test.

¶ 24        Our review of the issue raised in this case indicates that it presents an issue of statutory interpretation of the procedural requirements for determining a minor's parentage.  See 750 ILCS 46/101 *et seq.* (West 2016).  Additionally, we must determine the effect of the undisputed facts of this case, thus presenting a question of mixed law and fact.  A mixed question of law and fact is one involving an examination of the legal effect of a given set of facts.  *Anderson v. First American Group of Companies, Inc.*, 353 Ill. App. 3d 403, 407 (2004).  In a mixed question of law and fact, the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the rule of law as applied to the established facts is or is not violated.  *Id*.

¶ 25        Here, the question as to whether Bruce's voluntary acknowledgment of parentage supersedes the minor's request for a DNA test presents a mixed question of law and fact.  Our analysis is partly factual because we must consider how the facts fall within the requirements

of the Parentage Act. However, we also face a legal question in interpreting certain provisions of the Parentage Act.

¶ 26    Mixed questions of law and fact are subject to the clearly erroneous standard, which gives less deference to the lower court's decision. *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 369 (2002). We will reverse only if, after review of the entire record, we are "left with the definite and firm conviction that a mistake has been committed." *Id.* (Internal quotation marks omitted).

¶ 27                                C.  Rules of Statutory Construction

¶ 28    When reviewing a statute, our goal is to determine and effectuate the legislature's intent, best indicated by giving the statutory language its plain and ordinary meaning. *J.S.A. v. M.H.*, 224 Ill. 2d 182, 196 (2007). In determining the intent of the General Assembly, we begin by examining the language of the statute, which is the most reliable indicator of the legislature's objective in enacting a particular law. *Id.* at 196-97. Reviewing courts will not depart from the statute's plain language by reading into it conditions, exceptions, or limitations that contravene legislative intent. *Id.* at 197.

¶ 29    One of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole. *Id.* Accordingly, words and phrases must be interpreted in light of other relevant provisions of the statute and not construed in isolation. *Id.* Additionally, we interpret statutes as a whole, rejecting an interpretation that exalts one provision of a statutory scheme over another. *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 95.

¶ 30    Whether a statutory command is directory or mandatory is a question involving statutory construction that we review *de novo*. *Board of Education of Waukegan Community Unit School District 60 v. Illinois State Charter School Commission*, 2018 IL App (1st) 162084, ¶ 68. If a

statute expressly prescribes a consequence for failure to obey a statutory provision, that is very strong evidence that the legislature intended the consequence to be mandatory. *Id.* Therefore, under the mandatory-directory dichotomy of statutory construction, it is not the use of obligatory language, such as the use of the word "shall," that determines whether a statutory command is mandatory or directory, but rather whether noncompliance with such language dictates a resulting consequence. *Id.*

¶ 31                                    D.  Statutory Framework

¶ 32        We begin by outlining the applicable statutory provisions of the Parentage Act of 2015. This is a relatively new piece of litigation and our research has yielded no prior discussions of this framework in a published opinion.

¶ 33        The Parentage Act is a statutory mechanism that serves to authorize trial courts to legally establish parentage.  750 ILCS 46/105 (West 2016).

¶ 34        Section 46/201 of the Parentage Act (750 ILCS 46/201 (West 2016)) governs the establishment of the parent-child relationship. That section states that a parent-child relationship is established between a woman and a child by having given birth to the child. 750 ILCS 46/201(a)(1) (West 2016).  As to the establishment of a parent-child relationship between a man and a child, the Parentage Act indicates, in pertinent part, that such relationship is established by: (1) an unrebutted presumption of the man's parentage of the child under Section 204; (2) an effective voluntary acknowledgment of paternity by the man under Article 3 of the [Parentage] Act, unless such acknowledgment has been rescinded or successfully challenged; (3) an adjudication of the man's parentage * * *.  750 ILCS 46/201(b)(1)-(3) (West 2016).

¶ 35        Section 46/202 of the Parentage Act declares that "every child has equal rights under the law regardless of the parents' legal relationship." 750 ILCS 46/202 (West 2016). Section 46/203 indicates that a parent-child relationship established under the Act applies for all purposes, except as otherwise specifically provided by other law of this State. 750 ILCS 46/203 (West 2016).

¶ 36        Section 46/204 of the Parentage Act defines a presumption of parentage. Under that section, parentage is presumed if: (1) the person and the mother have entered into a marriage or civil union or a substantially similar legal relationship and the child was born to the mother during such relationship; (2) the person and the mother were in a marriage, civil union or substantially similar legal relationship, and the child is born within 300 days of the termination of such relationship by death, divorce, declaration of invalidity of the marriage or legal separation; (3) the person and the mother entered into a marriage, civil union or substantially similar relationship that was since invalidated and the child was born during the relationship or within 300 days of the termination of the relationship; and (4) after the child's birth, the person and the mother entered into a marriage, civil union or substantially similar relationship, even if such relationship can be later invalidated, and the person is named, with their written consent as the child's parent on the birth certificate. 750 ILCS 46/204 (West.Supp. 2017).

¶ 37        Additionally, a parent-child relationship may be established by the voluntarily signing and witnessing of a voluntary acknowledgment in accordance with Section 12 of the Vital Records Act (410 ILCS 535/12 (West 2018)), and Section 10-17.7 of the Illinois Public Aid Code (305 ILCS 5/10-17.7 (West 2016)). 750 ILCS 46/301 (West.Supp. 2017).

¶ 38        Section 12 of the Vital Records Act specifically requires that when a child is born to an unmarried woman or a married woman whose husband is not the child's father, the parties are

provided an opportunity to sign a voluntary acknowledgment of parentage (or denial of parentage); such forms conclusively establish parentage under the Parentage Act of 2015; and the forms indicate that the parties waived their right to DNA testing. 410 ILCS 535/12(a) (West 2018).

¶ 39 Section 10-17.7 of the Public Aid Code provides that an administrative determination of parentage can be made if the mother and father both sign a voluntary acknowledgment of paternity or agree to be bound by the results of genetic testing or in cases where the alleged father failed to respond to a notification of support obligation. 305 ILCS 5/10-17.7 (West 2016).

¶ 40 Section 401 of the Parentage Act provides that: upon the request of any party, except as provided in section 610 of the [Parentage] Act, or of the child, the court or an administrative hearing officer shall order or direct the mother, the child and the alleged father to submit to DNA testing to determine inherited characteristics. If any party refuses to submit to DNA testing, the court may resolve the question of paternity against the party or enforce its order if the rights of others and the interests of justice so require. 750 ILCS 46/401 (West 2016).

¶ 41 The Parentage Act further provides that an adjudication to determine parentage may be brought by the child, a parent, or a representative authority authorized by law to act for an individual who would otherwise be entitled to maintain a proceeding but is a minor. 750 ILCS 46/602 (West.Supp. 2017).

¶ 42 Section 610 of the Parentage Act addresses when a party's motion for genetic testing may be denied by a court. Under that section, a trial court may deny a motion for genetic testing if: (1) the conduct of the parent, acknowledged parent, adjudicated parent or presumed parent estops them from denying parentage; (2) it would be inequitable to disprove the parent-child

relationship; and (3) it is in the child's best interests to deny genetic testing based on the following factors:

(a) the length of time between the proceedings and when the parent was placed on notice that he or she may not be the child's parent; (b) the length of time during which the parent assumed parentage; (c) the facts surrounding the discovery of possible nonparentage; (d) the nature of the relationship between the child and the presumed, acknowledged or adjudicated parent; (e) the age of the child; (f) the harm that may result to the child if parentage is successfully disproved; (g) the nature of the relationship between the child and the alleged parent; (h) the extent to which the passage of time reduces the chances of establishing the parentage of another person and child support obligation in favor of the child; (i) other factors that may affect the equities resulting from the disruption of the parent-child relationship; and (j) any other factors the court determines to be equitable. 750 ILCS 46/610(a) (West.Supp. 2017).

¶ 43     It is presumed to be equitable and in the best interests of the child to grant a motion by the child (represented by a guardian *ad litem* or attorney) seeking an order for genetic testing. 750 ILCS 46/610(b) (West.Supp. 2017). The court's order denying the child's request must state the basis upon which the presumption was overcome. *Id.*

¶ 44     An order for genetic testing is enforceable through a proceeding for adjudication of contempt. 750 ILCS 46/615(a) (West 2016). If an individual whose parentage is being determined declines to submit to genetic testing ordered by the court, the court may adjudicate parentage contrary to the position of that individual. 750 ILCS 46/615(b) (West 2016).

¶ 45     Additionally, a respondent in proceedings to adjudicate parentage may admit to the parentage by filing a pleading to that effect or by admitting parentage under penalty of perjury

when making an appearance or during a hearing. 750 ILCS 46/616(a) (West 2016). If the court finds that the admission of parentage satisfies the requirements of this section and there is no reason to question the admission, the court shall enter an order adjudging the child to be the child of the person admitting parentage. 750 ILCS 46/616(b) (West 2016).

¶ 46                                    E. Analysis

¶ 47         At oral argument held on November 19, 2020, both the minor and the State[3] argued that *In re Devon M.*, 344 Ill. App. 3d 503 (2003) resolved the issue of what happens when a father refuses to take a DNA test, contending that the court could not accept voluntary admission "unfettered." Additionally, both parties contended that Bruce's admission does not supersede the minor's DNA test request and further argued that the word "shall" in section 616 (750 ILCS 46/616(b) (West 2016)) of the Parentage Act is mandatory.

¶ 48         Other arguments made by the parties at oral argument included that Bruce was not the "presumed parent" of the minor under the Parentage Act; that other cases stand for the proposition that the court must give a parenting test when requested by a party; that section 610(b) of the Parentage Act, which referenced the "best interest of the child" does not apply because Bruce was not a presumed party; and that the trial court's result destroys sections 401 and 404 anytime DNA testing comes into play. We first examine *Devon M.* to determine its relevancy to the case before us.

¶ 49         *Devon M.* was a consolidated appeal from three separate parentage determinations where the trial court entered paternity findings against putative fathers.

_____

[3] Neither Ericka's counsel nor Bruce's counsel participated in oral argument.

¶ 50    Regarding Donnell M. (age five), the minor's father was unknown, but the court ordered the father of the some of his siblings to take a DNA test. Subsequently, the mother named other men as the fathers of some of her other children, and J.F. as Donnell's father. Once J.F. was found, he stated that he knew the mother and did not know whether Donnell was his child, but it was possible. The court ordered him to take a DNA test, but J.F. did not show up for testing. The mother subsequently testified that she believed J.F. was Donnell's father and the State asked for a default finding that J.F. was the father. The court then entered a finding of paternity against J.F. pursuant to section 11(a) of the Parentage Act of 1984 (1984 Parentage Act) (750 ILCS 45/11(a) (West 2002)).

¶ 51    Regarding C.P. (age five), the mother testified that L.P. was the minor's father. At a hearing, L.P. testified that he did not know whether he was the minor's biological father and did not appear for DNA testing. The court subsequently named L.P. as the father over the guardian's objections that the findings did not serve C.P.'s interests and the evidence did not clearly and convincingly demonstrate paternity.

¶ 52    Finally, regarding Devon M. (less than a year old), Ras M. was listed as the minor's father and the minor needed a blood transfusion. Ras testified that he was sure he was the minor's father. However, his uncle testified that Ras indicated that he did not think the minor was his child. Although Ras did not object to the order for DNA testing, he never appeared for the test. The guardian moved to strike his name as the minor's father, but the court found that his testimony in court, and his refusal to take the test, proved clearly and convincingly that he was the father. On appeal the father requested an affirmance of the trial court's judgment naming him the father.

¶ 53    In that case, the court interpreted section 11(a) of the 1984 Parentage Act. That section stated as follows:

> "(a)   As soon as practicable, the court or Administrative Hearing Officer in an Expedited Child Support System may, and upon request of a party shall, order or direct the mother, child and alleged father to submit to [DNA] tests to determine inherent characteristics.  If any party refuses to submit to the tests, the court may resolve the question of paternity against that party or enforce its order if the rights of others and the interests of justices so require."  750 ILCS 45/11(a) (West 2000).

¶ 54    The court in *Devon M.* determined that section 11(a) of the 1984 Parentage Act authorized a sanction of paternity as a sanction against an alleged father, but limited that authority to cases in which "the rights of others and the interests of justice * * * require[d]" such a finding.  *Devon M.*, 344 Ill. App. 3d at 509.  The court further noted that while the trial court relied on section 11(a) as authority for the paternity judgments, the court did not explain what rights of others or interests of justice required the judgment.  The court found that none of the determinations of paternity appeared to serve any of the minors' interests, identified the father of each child as a man who at some time questioned the alleged paternity, and each determination left the question of biological paternity unresolved.  *Devon M.*, 344 Ill. App. 3d at 511.  In so finding, the court cited the evidence of multiple fathers for the mothers' children at least suggests the possibility that some men other than those named may be the minors' fathers.  With regard to Ras, the court noted that he alone argued in support of the paternity determination and showed interest in acting as the minor's father.  However, the court still reversed the trial court's finding and welcomed him to comply with the trial court's order to take a DNA test.

¶ 55       We find the results in *Devon M.* to be distinguishable from the circumstances of the instant case. We first note that *Devon M.* only interpreted and applied section 11(a) from an earlier version of the Parentage Act, which is codified in section 401 in the current Parentage Act. However, in this case, the trial court did not apply section 401 in determining that Bruce was the minor's father. Instead, the trial court applied section 616, which applies to the situation where a respondent admits to parentage under penalty of perjury when making an appearance or during a hearing. 750 ILCS 46/616(a) (West 2016). That section further provides that if the court finds that the admission of parentage satisfies the requirements of this section and there is no reason to question the admission, the court shall enter an order adjudging the child to be the child of the person admitting parentage. 750 ILCS 46/616(b) (West 2016).

¶ 56       Additionally, the court in *Devon M.* did not examine the prior version of section 616 (if any existed). The parties' reliance on this case is misplaced where, as here, Bruce admitted parentage under oath at a hearing and the court found no reason to question the admission. Moreover, the parties' argument would have us interpret section 401 as having more importance than section 616. We decline to do so as it violates the basic rules of statutory construction. *J.S.A.*, 224 Ill. 2d at 197.

¶ 57       We turn our attention to the circumstances of the instant case. In this case, parentage proceedings were commenced during a petition for adjudication of wardship of the minor against Ericka, and there was no father named on the minor's birth certificate. Ericka initially stated that Leonard was the minor's father, and the court entered an order for DNA testing of Leonard and the minor at the public guardian's request. When the test results confirmed that Leonard was not the minor's father, Ericka told a caseworker than Bruce might be the minor's father. Ericka then told the court unequivocally that Bruce was the minor's father. The trial

court subsequently entered an order for Bruce to submit to DNA testing at the public guardian's request pursuant to section 616 of the Parentage Act.

¶ 58        At a subsequent court date, Bruce initially stated that he could possibly be the minor's father, but refused DNA testing, saying he already knew he was the father, and that he wanted to accept paternity. During the course of the proceedings, Bruce refused DNA testing a few more times when asked. Bruce later stated under oath that he was certain that he was the minor's father. The mother was not present. Over objections by the public guardian and the State, the trial court entered an order finding that Bruce was the minor's father by admission where both the mother and the father stated that he was the minor's father, and further that it could not force Bruce to take a DNA test.

¶ 59        We must make the following determinations: (1) whether the trial court could compel Bruce to submit to DNA testing even after he made a voluntary acknowledgment of parentage under oath at a hearing as the parties suggest; (2) whether such order, which the court vacated, should nonetheless have been enforced through contempt proceedings when Bruce refused; and (3) whether the best interests of the child dictated that DNA testing should have been conducted, namely whether there was reason to question Bruce's admission of parentage.

¶ 60        The parties' arguments rest primarily on section 401 of the Parentage Act, which allows a party to request a court order for genetic testing. 750 ILCS 46/401 (West 2016). That section further indicates that a party who refuses to submit to DNA testing on the court's order may have parentage adjudicated against them or have the order enforced if others' rights or the interest of justice requires it. 750 ILCS 46/401 (West 2016). Thus, it is clear that the trial court had the right to compel Bruce to submit to DNA testing on the public guardian's motion

as the minor's parentage was at controversy in the proceedings below. However, that is not the end of our discussion.

¶ 61        Despite finding that a trial court can compel DNA testing, we further find that the trial court was not obligated under the Parentage Act to enforce its order for DNA testing by holding Bruce in contempt when he refused. An order compelling testing is deemed proper, and a party can be held in contempt for refusing to comply. *J.S.A.*, 384 Ill. App. 3d at 1007 (court's order compelling DNA testing was proper, and the contempt order is affirmed for his refusal to comply with the court's order). Additionally, section 615 of the Parentage Act states that an order for DNA testing is enforceable through contempt proceedings and that if a party refuses to submit, the court may adjudicate parentage against him. 750 ILCS 46/615 (West 2016). However, while the statute indicates that a party can be held in contempt for refusing to comply and that the court may also adjudicate parentage against him, we do not find either provision to be mandatory, as the legislative use of such words is considered permissive as opposed to mandatory for purposes of statutory construction. See *Salier v. Delta Real Estate Investments, LLC*, 2020 IL App (1st) 181512, ¶ 47. Additionally, neither of those sections addresses the circumstances present here, namely, when a party voluntarily acknowledges parentage under oath at a hearing.

¶ 62        As previously noted, the Parentage Act allows for the voluntary acknowledgment of parentage by either completing a voluntary acknowledgment of parentage form (750 ILCS 46/301 (West.Supp.2017)) or by filing a pleading acknowledging parenting or making such acknowledgment under oath (750 ILCS 46/616 (West 2016)). Here, Bruce did not complete a voluntary acknowledgment of parentage form, and the record does not indicate that he filed any pleadings acknowledging parentage. However, he did make an acknowledgment under

oath, in open court. Bruce's voluntary acknowledgement of parentage under oath satisfied the statute and obviated the need for DNA testing. Section 616(b) allows the trial court to accept such voluntary acknowledgment when there is no reason to question the admission. 750 ILCS 45/616(b) (West 2016). Here, both Ericka and Bruce stated in court that Bruce was the minor's father. Thus, section 616 was satisfied.

¶ 63    As such, we disagree with the public guardian and the State that the trial court should have rejected Bruce's acknowledgment of parentage. We make this finding despite acknowledging that the public guardian had previously moved for genetic testing. However, the parties have not provided any support for their argument that section 401 is absolute and supersedes a trial court's finding of voluntary parentage under section 616. The fact that the Parentage Act contains both sections means that the legislature intended for both sections to be applicable.

¶ 64    The Parentage Act provides that the court can enter an adjudication of parentage by admission if there is no reason to question the admission. (750 ILCS 46/616(b) (West 2016)). Although Ericka had previously named another man as A.S.'s father we find that such action did not cast doubt onto both Ericka's testimony that Bruce was the father and Bruce's voluntary acknowledgment of parentage under oath in open court. Nor have the parties shown that any other person could be the minor's father, rather they are thrashing about in hopes of finding yet a third putative father when Bruce has already admitted that he is the father and willing to take on that responsibility.

¶ 65    A trial court has no inherent authority to deviate from the plain language of the Parentage Act and exceed its parameters. *J.S.A.*, 384 Ill. App. 3d at 1012. As such, we conclude that the trial court's order fully complied with the statutory requirements of the Parentage Act and was not clearly erroneous.

¶ 66                                          CONCLUSION

¶ 67            For the foregoing reasons, we affirm the order of the trial court.

¶ 68            Affirmed.